# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | Case No. 2:14CR00001 |
| v. | **OPINION AND ORDER** |
| DOUGLAS EUGENE STEPHENS and CECIL A. MCCONNELL, JR., | By: James P. Jones<br>United States District Judge |
| Defendants. | |

*Zachary T. Lee, Assistant United States Attorney, Abingdon, Virginia, for United States; Michael A. Bragg, Bragg Law, Abingdon, Virginia, for Defendant Douglas Eugene Stephens, and Brian J. Beck, Assistant Federal Public Defender, Abingdon, Virginia, for Defendant Cecil A. McConnell, Jr.*

Defendants Douglas Eugene Stephens and Cecil A. McConnell, Jr., were convicted by a jury in this court of offenses related to the distribution of controlled substance analogues, and now jointly move for a new trial pursuant to Federal Rule of Criminal Procedure 33. The defendants assert that the government violated their due process rights by failing to disclose evidence regarding the ongoing criminal conduct of one of the government's witnesses. *See Brady v. Maryland*, 373 U.S. 83, 86-88 (1963). They contend that the undisclosed information would have impeached the credibility of several government witnesses and undermines confidence in the jury's guilty verdict. Because I am persuaded that the government had no duty to disclose the evidence and that, even if it had such a

duty, the evidence was not material to the outcome of the trial, I will deny the defendants' motion.

I.

The facts relevant to the defendants' motion are as shown in the record and in the parties' submissions. The case involves a conspiracy of numerous individuals to distribute controlled substance analogues, specifically synthetic cannabinoids, from retail establishments located in this judicial district. On September 27, 2013, state and federal search warrants were executed at locations operated by certain of the defendants. These searches yielded large quantities of synthetic cannabinoids, cash, and other evidence.

On February 25, 2014, Stephens and McConnell, along with other co-defendants, were indicted for conspiracy to possess and distribute synthetic marijuana in violation of the Controlled Substances Analogue Enforcement Act, 21 U.S.C. § 802(32), and other related offenses. Prior to trial, most of the defendants pleaded guilty pursuant to plea agreements with the government, and only McConnell and Stephens ultimately proceeded to trial. One of the codefendants, J.P., pleaded guilty to charges of misbranding in violation of 21 U.S.C. § 331 and § 332(a)(2), and conspiracy to commit misbranding in violation of 21 U.S.C. § 371. As part of J.P.'s plea agreement, the parties agreed to recommend to the court a sentence of thirty-six months imprisonment. The plea agreement also

provided that J.P. would not receive a reduced sentence based on substantial assistance to the government. J.P.'s wife, L.P., pleaded guilty pursuant to a plea agreement to a charge of conspiracy to distribute controlled substance analogues in violation of 21 U.S.C. § 846.

Prior to Stephens' and McConnell's joint trial, the government disclosed to the defendants voluminous evidence regarding the conspiracy. The discovery included a report of a law enforcement interview with J.P. and L.P., during which they discussed their involvement in the distribution of synthetic marijuana from their retail store. During the interview, they explained that their main supplier was their codefendant Emmanuel Vestal, but that they also purchased the substances from other, unindicted suppliers. Further, the government disclosed various other interview reports that corroborated J.P.'s and L.P.'s admissions, including that they received synthetic marijuana from multiple suppliers. Finally, the government disclosed an email from Detective Richard Stallard of the Southwest Virginia Drug Task Force confirming that synthetic marijuana was still available for purchase at J.P.'s store in February 2014, several months after the search warrants were executed at the store.

On October 14, 2014, the jury trial for defendants McConnell and Stephens commenced. J.P. and L.P. testified on behalf of the government, detailing their involvement in the drug conspiracy and inculpating McConnell and Stephens. In

particular, they confirmed that McConnell and Stephens had purchased large amounts of synthetic cannabinoids from Emmanuel Vestal and other suppliers and held them out to the public for retail sale. Each witness was subject to rigorous cross-examination regarding their plea agreements and possible incentives to testify for the prosecution. J.P. maintained that, because his plea agreement recommended a minimum sentence, he lacked an incentive to testify in exchange for leniency, whereas L.P. acknowledged that she was cooperating with the government in hopes of receiving a reduced sentence. On October 22, 2014, the jury returned verdicts of guilty against both defendants for conspiracy to distribute controlled substance analogues, as well as other related offenses.

On November 4, 2014, defense counsel learned from documents filed with the court, including a petition to revoke J.P.'s bond and an agreement with the government to modify his sentence (ECF Nos. 333 and 334), that J.P. had continued to purchase and sell large quantities of synthetic cannabinoids after his arrest, up to and during Stephens' and McConnell's trial. In response to defense counsel's request for more information, the prosecutor advised that prior to trial, on October 14, 2014, L.P. had met with him and ATF Special Agent Ryan Temm in preparation for her testimony. During this meeting, she informed the prosecutor and the agent that she believed that J.P. was continuing to receive shipments of synthetic drugs from Florida, although she could not provide any other details.

Special Agent Temm elaborated that he had received information from Detective Stallard, who would later also testify for the government at trial, that there were "rumors" in the community that J.P. was continuing to receive shipments of synthetic drugs. As a result of this information, on October 17, 2014, Special Agent Temm requested that postal inspectors notify him of any packages sent to J.P. through the post office in Coeburn, Virginia. None of this information was disclosed to Stephens' or McConnell's defense counsel.

On October 29, 2014, Special Agent Temm was notified by a U.S. Postal Inspector that a package addressed to J.P. with a return address in Florida had arrived at the Coeburn Post Office. A check revealed that the Florida return address did not exist. The package was opened the next day at a meeting with J.P., his attorney, the prosecutor, and federal agents, and found to contain approximately 1.3 kilograms of synthetic marijuana. J.P. then provided further details about his continued involvement with the synthetic drug trade, including the identity of his supplier in Florida.[1] He agreed to a revocation of his bond and an increase in the proposed sentence contained in his plea agreement.

Based on this information, the defendants contend that the government deprived them of the opportunity to mount an effective defense at trial by failing to disclose the following: (1) L.P.'s statement that J.P. was continuing to sell

---

[1] The defendants claim that J.P. met the supplier through Phillip Ison, one of the government's witnesses at trial, but do not provide evidence to support this assertion.

synthetic marijuana; (2) Detective Stallard's comment to Agent Temm about rumors of J.P.'s activities; and (3) Agent Temm's request that postal inspectors monitor J.P.'s packages. In particular, the defendants claim that disclosure of this information prior to trial would have enabled them to impeach the credibility of J.P. as a government witness due to his continued engagement in criminal activity after his arrest and while testifying during trial. They contend that information regarding suppliers other than Emmanuel Vestal may have cast doubt on the government's theory of the case, which identified Vestal as a main supplier of the conspiracy. Further, the defendants assert that the information could have been used to attack the credibility of L.P. and Detective Stallard, who both testified for the government at trial. Finally, they argue that the information may have enabled further follow-up investigation, which could have produced further evidence favorable to the defendants.

## II.

A motion for a new trial may only be granted "if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court "should exercise its discretion to grant a new trial sparingly." *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003) (internal quotations marks and citations omitted).

Here, the defendants assert that a new trial is required due to the government's alleged violation of its disclosure obligations under *Brady v.*

*Maryland*, 373 U.S. 83 (1963). In *Brady*, the Supreme Court established that "'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *United States v. Wilson*, 624 F.3d 640, 661 (4th Cir. 2010) (quoting *Brady*, 373 U.S. at 87). The government's obligation to disclose includes evidence impeaching witness credibility, such as agreements between the government and its witnesses. *See United States v. Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule.") (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)). However, while the government must disclose exculpatory evidence, there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." *Moore v. Illinois*, 408 U.S. 786, 795 (1972). In particular, the government has no obligation to disclose "'preliminary, challenged, or speculative information'" to the defendant. *United States v. Agurs*, 427 U.S. 97, 110 n.16 (1976) (quoting *Giles v. Maryland*, 386 U.S. 66, 98 (1972) (Fortas, J., concurring)); *Tate v. Wood*, 963 F.2d 20, 25 (2d Cir. 1992).

In order to prove the government violated its *Brady* obligations, the defendant has the burden of showing that the undisclosed evidence was: "(1)

-7-

Case 2:14-cr-00001-JPJ-PMS   Document 366   Filed 12/08/14   Page 7 of 12   Pageid#: 3277

favorable to him either because it is exculpatory, or because it is impeaching; (2) material to the defense, i.e., prejudice must have ensued; and (3) that the prosecution had materials and failed to disclose them." *Wilson*, 624 F.3d at 661 (internal quotation marks omitted). Evidence is considered favorable if, when "'disclosed and used effectively'" by the defense, it "'may make the difference between conviction and acquittal.'" *Id.* (quoting *Bagley*, 473 U.S. at 676). Evidence is material when its cumulative effect is such that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (internal quotation marks and citation omitted). A reasonable probability does not mean that the "defendant would more likely than not have received a different verdict with the evidence," but rather that the absence of the evidence was sufficient to "undermine[] confidence" in the outcome. *Id.* at 434 (internal quotation marks and citation omitted). Regarding impeachment evidence, the Fourth Circuit has emphasized that "when the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility" is material and falls within the *Brady* rule. *United States v. Ellis*, 121 F.3d 908, 917 (4th Cir. 1997) (internal quotation marks and citation omitted).

I conclude that the undisclosed information in this case does not fall within the scope of *Brady*'s requirements for several reasons. First, the information

regarding J.P.'s continued criminal activities was speculative and preliminary at the time of trial, and the government therefore had no obligation to disclose it. *See Agurs*, 427 U.S. at 110 n.16; *Tate*, 963 F.2d at 25. Although L.P. claimed that J.P. was continuing to receive shipments of synthetic marijuana from Florida at the time of trial, she could not name the source of the drugs or provide any other concrete information. Similarly, Detective Stallard's comments were based on unconfirmed rumors within the community. These suspicions were not confirmed until receipt of the package containing synthetic marijuana at the post office on October 29, 2014, after the trial had concluded. Without more, the information amounted to an unsubstantiated hunch that required greater investigation to confirm.[2]

Second, it is questionable whether the evidence could even be considered favorable to the defendants, given that its value for impeachment purposes was tenuous. Although the defendants claim that the evidence would have reflected poorly on the credibility of government witnesses L.P. and Detective Stallard, they offer little explanation of how allegations of criminal activity by J.P. would reflect poorly on these other witnesses who were not themselves accused of any

---

[2] The defendants' reliance on *United States v. Veras*, 51 F.3d 1365 (7th Cir. 1995), is unpersuasive. In that case, disclosure of accusations against a testifying officer was required, given that the accusations were investigated for more than two years and had enough supporting evidence to support recusal from the case by the officer's employing police department. *Id.* at 1374-75. Here, by contrast, the information was essentially unverified rumors that were not substantiated until after the trial had concluded.

misconduct. The evidence's impeachment value against J.P. as a witness would have also been limited, given that he did not deny selling synthetic drugs, and there was ample evidence presented at trial of his involvement in the conspiracy, including conduct occurring months after search warrants were served on his business and evidence seized. *See McHone v. Polk*, 392 F.3d 691, 699-700 (4th Cir. 2004) (noting that, where witness's pretrial statements did not contradict testimony and evidence presented at trial, impeachment value of statements was limited).

Further, even if J.P.'s continued involvement in the conspiracy had come to light at trial, it is difficult to imagine how this might have helped the defendants' case. The defendants claim that the undisclosed information could have been used to prove that J.P. was purchasing drugs from another source besides Vestal, thus casting doubt on the government's theory of the conspiracy, in which Vestal was a central figure. However, the defendants received abundant evidence prior to trial that there were multiple sources of drugs for the conspiracy, including admissions by J.P. and L.P. in their interviews with law enforcement officials. Moreover, the defendants themselves did not deny the existence of a conspiracy at trial, but instead attempted to minimize their involvement — Stephens by claiming that he withdrew from the conspiracy after an argument with Vestal, and McConnell by claiming that his son operated the store and thus bore the responsibility. In

-10-

Case 2:14-cr-00001-JPJ-PMS   Document 366   Filed 12/08/14   Page 10 of 12   Pageid#: 3280

addition, the defendants argued that their products were not sold for human consumption and that they did not meet the statutory definition of controlled substance analogues. None of these defenses would have been bolstered by evidence of J.P.'s continued criminality.

Finally, the information had no chance of affecting the outcome of the trial in light of the overwhelming evidence of the defendants' guilt, and was therefore not material. Even if the defendants had been successful in impeaching the credibility of J.P., L.P., and Detective Stallard with the undisclosed evidence, the testimony of these witnesses was corroborated by extensive testimonial, video, and documentary evidence presented over the course of a multi-day trial. Therefore, the witnesses' testimony was cumulative, and the impact of the undisclosed evidence would have been marginal at best. *Ellis*, 121 F.3d at 918 (noting that, in determining materiality, court will not "ignore other evidence presented at trial in determining [its] confidence in the outcome," and will instead "evaluate the whole case, taking into account the effect that the suppressed evidence" would have had at trial); *cf. United States v. Amiel*, 95 F.3d 135, 145 (1996) (noting that impeachment evidence is material if "the witness whose testimony is attacked supplied the only evidence linking the defendants to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case" (internal quotation marks and citation omitted)). Given the

strength of the government's case, the undisclosed evidence fails "to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

For these reasons, it is **ORDERED** that the defendants' Motion for a New Trial (ECF Nos. 336 & 337) is DENIED.

ENTER: December 8, 2015

/s/ James P. Jones
United States District Judge